UNITED STATES of America, Plaintiff,

v.

CRAWFORD ENTERPRISES, INC., et al., Defendants.

PETROLEOS MEXICANOS, Plaintiff,

v.

CRAWFORD ENTERPRISES, INC., et al., Defendants.

Crim. No. H–82–224, Civ. No. H–83–6418.

United States District Court, S.D. Texas, Houston Division.

Sept. 3, 1986.

Kenneth R. Wynne, Bracewell & Patterson, Houston, Tex., for plaintiff.

William F. Pendergast, U.S. Atty., George Kelt, Asst. U.S. Atty., for movant U.S.

Richard N. Carrell, Fulbright & Jaworski, Houston, Tex., for Crawford Enterprises, Inc., Crawford Disc, Inc., Crawford Intern., Inc., Crawford Enterprises Mfg., Inc., a/k/a International Process Fabricators, Inc., Crawford-Miller Intern., Inc., and Donald G. Crawford.

David T. Maddox, Calvin, Dylewski, Gibbs, Maddox, Russell & Shanks, Houston, Tex., David Boies, Cravath, Swaine & Moore, New York City, for Ruston Gas Turbines, Inc.

James A. Goold, Kirkland & Ellis, Chicago, Ill., for International Harvester.

Ronald J. Blask, Blask, Cruver & Evans, Houston, for other defendant.

Daniel J. Hurson, Washington, D.C., C. Leland Hamel, Houston, Tex., for James R. Smith.

Morton L. Susman, Weil, Gotshal & Manges, Houston, Tex., for Crawford Enterprises, Inc.

Herbert J. Miller, John J. Cassidy, William H. Jeffress, Jr., Jonathan Sallet, Randall J. Turk, Washington, D.C., for Donald G. Crawford.

James F. Neal, Nashville, Tenn., for William E. Hall.

Theo W. Pinson, III, Houston, Tex., for Andres I. Garcia.

Charles J. Sullivan, Houston, Tex., for George S. McLean.

Edward McDonough, Dan Kasprzak, Larry Lynn, McDonough & Horne, Houston, Tex., for Al Lee Eyster.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, Chief Judge.

A reconvened contempt hearing was held before this Court on June 9, 1986. The evidence now having been closed, this Court enters the following findings and conclusions pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. *Background of Subpoenas*

1. Defendants Crawford Enterprises, Inc. (CEI) and Donald G. Crawford (movants herein) were charged by an indictment filed October 2, 1982, with multiple violations of the Foreign Corrupt Practices Act. In essence, the indictment charged that CEI and Crawford had obtained contracts for the multi-million dollar purchase of gas compression equipment from Petroleos Mexicanos (Pemex) during 1977–79 through bribery of certain Pemex officials.

2. The defendants denied knowledge of any improper payments to Pemex officials, and vigorously contended that the awards of contracts were made in full compliance with the Pemex competitive bidding process; that the defendant's offers were superior to those of all other bidders taking into consideration the equipment offered, the price, and the promised delivery dates; and that the technical staff of Pemex's purchasing and production departments recommended the awards to the defendants after consideration of all bids on their merits.

3. The documents necessary for the defendants to prove their defense at trial could be found only in the files of Pemex, located principally in Mexico City. Pemex, an instrumentality of the Mexican government, was cooperating with the United States Justice Department in the investigation and prosecution of these defendants. Thus, voluntary cooperation from Pemex was not easily obtained.

4. Judge George C. Cire (now deceased), before whom the criminal trial was pending, on the defendants' motion, issued letters rogatory to Pemex on August 5, 1983, seeking production of documents relating to the procurements specified in the indictment, other procurements on which the defendants submitted bids (both successfully and unsuccessfully), Pemex purchasing procedures, and other matters. (Def.Exh. 6.) By December 1983, with the scheduled trial less than two months away, no resonse had been received from Pemex to the letters rogatory.

5. In the meantime, on October 28, 1983, Pemex filed a civil action in this Court against C.E.I., Mr. Crawford and others seeking recovery of some $135 million in alleged damages based upon allegations similar to those in the pending indictment. That civil action remains pending at this time.

### B. *The Subpoenas and The Orders Compelling Compliance*

6. On December 1, 1983, C.E.I. and Crawford served upon Pemex, pursuant to leave of Court granted under Rule 17(c), Federal Rules of Criminal Procedure, a subpoena duces tecum requiring production of the same materials earlier sought by the letters rogatory. (Df.Exh. 1.) Pemex moved for a protective order on the ground, *inter alia*, that compliance would be unduly burdensome. The motion was heard by Judge Cire on December 20 (Def. Exh. 5), and was granted only to the extent that the time for compliance was enlarged. By order dated December 30, 1983, Judge Cire directed: "All the requested documents shall be produced by Monday, February 6, 1984. Pemex shall produce the documents as they become available."

7. On January 13, 1984, the defendants (again with leave of court) served upon Pemex a supplemental subpoena duces te-

cum seeking six additional categories of documents (Def.Exh. 2). Another order was entered by Judge Cire on January 17, 1984, directing full compliance with both subpoenas through production of the offices of Pemex's local attorneys in Houston, with copying to take place at the defendants' expense. (Def.Exh. 4.)

8. Between January and April, 1984, Pemex produced thousands of pages of documents, primarily from Pemex's Houston office, in response to these two subpoenas and court orders. (Tr. 4–1–85, at pp. 91–93, 125.) The bulk of these documents, while responsive to certain paragraphs of the subpoena, did not concern the critical bidding process. (*Id.* at 92, 144.) A lesser number of documents were produced from the Mexico City office of Pemex, including a small number of documents concerning the biddings. (*Id.* at 145.) On March 6 and 8, 1984, defense counsel served Pemex's attorneys with letters (Def.Exhs. 8 and 9) detailing the documents which had been subpoenaed but not produced by Pemex, including most of the critical bid documentation.

9. During the following six weeks, Pemex supplied further documents which were again reviewed and analyzed by the defense staff, but the requests for the bidding and award documents again were largely unfulfilled. (Tr. 4–1–85, pp. 97–103.) By letter to Pemex's counsel dated May 2, 1984, defense counsel detailed the limited production made since the letters of March 6 and 8, and again demanded the missing documents. The letter further stated (Df.Exh. 10):

> In the event that any of the requested documents no longer are in Pemex's possession, custody or control, please indicate whether they were (i) removed from Pemex's files without Pemex's authorization, and if so when and by whom, (ii) transferred to another agency or division within the Mexican government, or (iii) destroyed, either by fire or otherwise.

10. Following receipt of this letter, Pemex produced no further documents responsive to the December and January sub-

poenas, nor did it respond to the request for explanation of the missing documents contained in the May 2 letter. (Tr. 4–1–85, pp. 55–56.) Accordingly, the defendants filed on June 8, 1984, a Motion to Compel Pemex to Comply with Court-Ordered Production (Def.exh. 31). Pemex did not respond to this motion in any manner whatsoever.

11. On July 17, 1984, Judge Cire granted the defendants' motion and once again ordered "that Pemex comply without further delay with this Court's previous order to produce all documents specified in the attachment to defendants' Rule 17(c) subpoenas." (Df.Exh. 5.) Pemex did not produce any further documents in response to this order, nor did it serve or file any accounting of the reasons for the absence of the unproduced documents.

12. When Judge Cire became critically ill, Chief Judge John V. Singleton transferred the criminal case to his docket and continued to preside over it. After Judge Cire's death Judge Singleton also transferred the civil case to his docket.

## C. *The Order to Show Cause and The Order of April 2, 1985*

13. The trial date of the criminal case against C.E.I. and Crawford, having been continued while the government took an interlocutory appeal to the Fifth Circuit from a pretrial order, was ultimately rescheduled to begin April 8, 1985. On February 13, 1985, the defendants, in a final effort to obtain the documents necessary to their defense, moved for an order to show cause why Pemex should not be held in contempt. Pemex opposed the motion, asserting that it had produced all the subpoenaed records in its possession, custody or control, and giving as the explanation for its "incomplete" documentation the following: "The only inference which can be drawn by the state of Pemex's documentation is that Crawford was somehow involved with the former Pemex employees in 'covering their tracks.'" (Pemex Response to Motion for Order to Show Cause, filed 2–21–85, p. 2).

14. An Order to Show Cause was issued by this Court on March 13, 1985, and the hearing began on April 1, 1985. At this hearing, Pemex's counsel stated (Tr. 4–1–85, p. 51):

What our evidence will be is not that every document that ever existed responsive to the descriptions in those subpoenas have been produced, but rather every blessed one that we can find now after the most diligent thorough kind of search possible has been produced.

Pemex claimed at the April 1 hearing, for the first time in the record of these proceedings, that a substantial number of the requested documents had been destroyed by fire in 1982, and repeated the contention that documents may have been removed from Pemex's files without authorization. (Tr. 4–1–85, pp. 166–167.)

15. At the hearing, the movants offered evidence through the testimony of John Sherman and Philip Evans, and the exhibits admitted in evidence, that (1) it was the custom and practice of Pemex to receive or prepare and to retain the types of procurement records specified in the subpoenas; (2) that these records were material to the defense of the criminal case (as well as Pemex's separate civil action); and (3) that the vast majority of the subpoenaed documents relating to the procurements at issue in the indictment, and others on which the defendants had submitted successful or unsuccessful bids, had not been produced, nor had any satisfactory reason been given for their absence. In addition, the movants identified specific Pemex documents—obtained by them from court records in Mexico, from discovery provided by the United States government, and from other sources—which demonstrated concretely that responsive and highly material and exculpatory records did exist in the files of Pemex that were not produced in response to the subpoenas and court orders at issue. (Def.Exhs. 14, 17, 18, 19, 20, 23, 24; see also Def.Exh. 27.)

16. With the concurrence of Pemex's counsel, the hearing was adjourned and the movants were directed to supply a narrowed list of the previously subpoenaed but unproduced documents considered most critical to the defense of the criminal case (Tr. 4–1–85, p. 211–215.) On April 2, such a list was provided, and the Court entered an order finding that Pemex had failed to produce all subpoenaed documents, directing that those specified on the narrowed list be produced by April 15 (later extended to April 29), and continuing the contempt hearing until further notice "without prejudice to the entry at a later date of an order imposing sanctions upon Pemex for failure to comply with this order and previous orders of this Court." (Def.Exh. 34.)

17. On April 4, 1985, defendants Crawford and C.E.I. entered pleas of nolo contendere to the indictment. The order to Pemex, however, was undisturbed, as the criminal case remained pending until such time as judgments were entered upon the pleas.

18. On August 22, 1985, the Crawford defendants filed a motion to reconvene the contempt proceedings. This motion was granted by the Court on September 3, 1985, and the reconvened hearing began on June 9, 1986. The findings below are made based on evidence heard during the reconvened hearing.

### D. The Supplemental Production of Documents on April 29, 1985

19. On April 29, 1985, Pemex produced to the defendants some 2,731 pages of additional documents. Many of these, as shown by Def.Exh. 38, were responsive to the order of April 2; all had been called for under the subpoenas served fourteen to fifteen months earlier. (Tr. 6–9–86, p. 49.) While many of these documents were relevant and exculpatory, the most striking example was an analysis of Pemex gas compression procurements between 1977–1979 (the years covered by the indictment), which reflected the number of bidders on each requisition, the prices offered, the delivery dates promised, and the basis upon which the winning bidder was selected, as well as other pertinent information. (Def. Exh. 39; see Tr. 6–9–86, pp. 42–48.)

This document was never produced by Pemex until *after* Pemex faced the likelihood of contempt sanctions, *after* the defendants on April 1 proved the likely existence of the document (see Def.Exhs. 22, 23, and 24), and *after* the defendants had entered pleas of nolo contendere to the criminal charges.

20. The April 29 production by Pemex, supplemented by production on November 26, 1985, of another four documents specifically described in the April 2 order (Tr. 6–9–86, p. 30), still left unproduced, however, the majority of documents which even Pemex's witnesses conceded to be the types of records customarily prepared in connection with the gas compression procurements at issue. (See Def.Exh. 44; Tr. 6–10–86, pp. 151, 251, 255–256.) Indeed, a complete set of the bidding contest records—which Pemex procedures required to be submitted to no fewer than three separate departments of Pemex (see Def. Exh. 43; Tr. 6–9–86 at pp. 38–39)—was produced on only one purchase order (see Def.Exh. 38, ¶ 29), and this was a job on which C.E.I. was not the successful bidder.

### E. *Pemex's Explanations for Nonproduction of The April 29 Documents*

21. The production by Pemex, under threat of contempt sanctions, of the 2731 pages of documents produced April 29, 1985, and the additional documents produced November 26, 1985, conclusively establishes that Pemex failed to comply fully with the subpoenas and the court orders of December 30, 1983, January 17, 1984, and July 17, 1984, directing that "all" requested documents be produced promptly.

Pemex contends that it acted in good faith and that such nonproduction was excusable, but its contentions are not persuasive based on the facts established at the hearing and the Court's assessment of the credibility of the witnesses, for the reasons explained below.

22. Pemex contended, through the testimony of Lic. Reyes, that it was unable to locate the documents earlier because of the supposed vagueness of the subpoenas, in contrast to the greater specificity of the April 2 order. (Tr. 6–10–86, pp. 181–182.) The Court does not find Lic. Reyes' testimony to be credible. By his own admission, the vast majority of the records produced on April 29 were found not because of greater specificity of the order, but because Pemex suddenly discovered a cache of files in the office of Ing. Gildardo San Martin Berman. (Tr. 6–10–86, pp. 169, 182–183, 204.) Furthermore, while the subpoenas were broad in the sense that they sought numerous categories of documents, they were not vague; indeed, every one of the purchase orders and requisition numbers specified in the April 2 order which Reyes claimed helped Pemex find documents after the order was issued (Tr. 6–10–86, p. 194–195) were also specified in the original subpoenas (Def.Exh. 1, ¶ 1; Def.Exh. 2, ¶ 3). Likewise, the majority of the Pemex internal bidder selection recommendations finally produced on April 29 (see Def.Exh. 38, ¶ 30; Def.Exh. 42) were also specifically identified *by number* in the January subpoena (Def.Exh. 2, ¶ 4).

23. Pemex also contended that its original search failed to locate the documents produced on April 29 because Ing. San Martin was either on vacation or out of the office at the times the search was conducted. (See Tr. 6–10–86, pp. 199–200, 224–225.) Again, the explanation is not credible. Ing. San Martin was employed by Pemex during the entire time the search was purportedly conducted, and while he claimed on direct examination not to have been involved in the purchasing process (Tr. 6–10–86, p. 220), he conceded on cross-examination not only that he was the head of the production department group in charge of analyzing the technical aspects of bids on gas compression equipment (*id.* at 250–254), but that he actually initiated requisitions, drafted the memoranda recommending the supplier, and prepared at some unspecified time the comprehensive analysis of all gas compression equipment procurements during 1977–79. (*Id.* at 249–252, 257–259.) San Martin also testified that at least three other persons in the

production department knew of the existence of the files in his office (Tr. 6–10–86, p. 274), none of whom was shown to be out of the office during the height of the search activity. And perhaps most significantly, San Martin revealed on cross-examination that his files *were* searched in December 1983 by Engineer Rene Martinez Decuir, whom San Martin directly identified as a Pemex employee who knew of the existence of the files in his office (Tr. 6–10–86, p. 274), yet the obviously relevant documents were not discovered. (*Id.* at 268.) San Martin's opinion that none of the documents were discovered at that time because the files were ill-organized (*id.* at 267), is the only suggestion offered as to why these documents were not timely produced to the defendants. This opinion cannot be credited in view of the fact that according to Lic. Reyes, the vast majority of the 2731 pages of documents produced April 29 were in the files supposedly searched previously, and in view of the obviously relevant, responsive and even exculpatory nature of many of the documents located in the files. The Court found San Martin to be a most evasive and wholly incredible witness.

24. Pemex also contended, again through the testimony of Lic. Reyes, that the naming of San Martin in one paragraph of the list attached to the April 2 order explains why Pemex was able to locate the documents at that time but not earlier. (Tr. 6–10–86, at 182–183.) In view of San Martin's obviously key role in these procurements, a fact well known to Pemex, no identification of him was necessary; but the fact is that he was named in an affidavit attached to the defendants' motion for an order to show cause served upon Pemex's counsel on February 13, 1985, yet according to Pemex, no one thought to ask him for documents until after April 2. (Motion for Order to Show Cause, filed Feb. 13, 1985 (affidavit of John J. Cassidy, ¶ 2)).

25. Pemex further contended generally that while numerous responsive documents were obviously not produced prior to April 29, its search was nonetheless as diligent, thorough, and in good faith as the law requires. This contention is contradicted by the fact that when the defendants, after repeatedly detailing the gaps in Pemex's compliance through correspondence (Def. Exhs. 8, 9 and 10), moved for and obtained the further order of July 17, 1984, compelling full compliance without further delay, Pemex did not undertake any further meaningful search of its files, but simply circularized the vaious departments with a memorandum repeating the requests of six months earlier and obtained, not surprisingly, cursory replies within a matter of 48 hours at the most, stating that all documents had previously been supplied. (See Resp.Exhs. 9, 10, 11, 12; Tr. 4–1–85 at 174–180; Tr. 6–10–86 at 207–215.) The contention is also contradicted by the fact that the Pemex official memoranda were maintained on microfilm, yet several of these memoranda—specifically identified *by number* in the defendants' subpoenas— were not searched for or produced until after the April 2, order, some sixteen months after they were requested. (Tr. 6–10–86, p. 268–269.)

26. Based upon all the evidence, the Court finds by clear and convincing evidence that the documents produced on April 29, 1985 and November 26, 1985 (with the exception of one document obtained from an outside engineering firm) did exist in Pemex's files in December, 1983 and continuously thereafter; that the documents were plainly called for by the subpoenas and court orders of December 30, 1983, January 17, 1984, and July 17, 1984; that a conscientious search conducted in good faith would have located those documents; and that Pemex either did not search the files in good faith, or did not produce the documents when located. The Court further finds that the nonproduction served Pemex's interest in hindering the defendants' ability to defend against criminal charges very similar to the civil complaint being pursued simultaneously by Pemex against these same defendants; that the documents were finally produced only after the defendants, after great expendi-

ture of time and expense, proved in open court not only the existence of the documents, but that they had discovered Gildardo San Martin's access to, familiarity with, and likely retention of them; and that certain testimony by Pemex representatives at the hearing on June 10, 1986, as to the purported reasons for nonproduction of the documents prior to April 29, 1985, was not credible. The Court also finds that Pemex had adequate notice of the nature of this hearing yet failed to produce one witness responsible for record-keeping or preparing any of the requested documents. Based upon these factors and the entire record of this proceeding, the Court further finds that beyond a reasonable doubt Pemex's failure to comply fully with the subpoenas and court orders was willful and inexcusable.

### F. Pemex's Explanations of the Continued Nonproduction of Documents

27. Even with the additional production following the April 2 order, Pemex has failed to produce most of the underlying documents it received or generated in connection with the bids and awards at issue. Pemex's own witnesses conceded that the documents described in Def.Exh. 44 are types customarily prepared and kept by Pemex (Tr. 6–10–86, pp. 151, 251, 255–256), and the testimony of John Sherman (Tr. 4–1–85, pp. 70–83) as well as the Pemex procurement internal procedures (Def. Exhs. 25, 26, 43) demonstrated not only that the documents were prepared but that copies were disseminated to numerous departments of the corporation.

28. Pemex contends a fire in September 1982 destroyed the unproduced records. This contention was not advanced until the hearing on the order to show cause on April 1, 1985. It was *not* mentioned in Pemex's motion for a protective order filed December 8, 1983, regarding the first subpoena. It was *not* mentioned by Pemex at the hearing on that motion before Judge Cire on December 20, 1983. It was *not* mentioned when in June 1984 the defendants filed a detailed motion to compel pro-

duction, particularly describing the wholesale failure to Pemex to produce critical categories of documents; indeed, Pemex filed no response to this motion at all. It was *not* mentioned in response to Judge Cire's July 17, 1984, order to produce "*all* documents" called for in the subpoenas "without further delay." It was *not* even mentioned in Pemex's opposition to the motion for an order to show cause, which gave as the sole reason for missing documents the speculation that "Crawford was somehow involved with the former Pemex employees in 'covering their tracks.'" (Petroleos Mexicanos response to Crawford Enterprises, Inc.'s and Donald G. Crawford's Motion for Order to Show cause, p. 2.) It was *not* mentioned in any other pleading, transcript or even correspondence prior to the time Pemex faced contempt sanctions on April 1, 1985. Indeed, even when the defendants by letter to Pemex's counsel in May 1984 specifically requested that Pemex indicate, in the event any requested documents no longer existed, whether they had been "destroyed, either by fire or otherwise" (Def.exh. 10), no response was forthcoming.

29. The evidence as to the fire does not establish that the mass of relevant bidding and award documents described on Defendants' Exhibit 44 are not in existence. While there was undoubtedly a fire in the upper floors of building B–2 in September 1982, the contention by the witnesses Solis and Reyes that all documents missing from the production were destroyed in that fire (Tr. 6–10–86 at 152–153, 169) is not persuasive. Both witnesses conceded on cross-examination that they had no personal knowledge that any particular subpoenaed document was destroyed (*Id.* at 156–157, 160, 172). No custodian of the files was called as a witness, nor was any post-fire report or damage assessment produced, even though Lic. Reyes testified a report was filed with the Mexican Justice Department (*id.* at 179). Further, certain photographs of the fire themselves show that great quantities of records survived the fire (Def.Exhs. 46, 47); Resp.Exhs. 380, 382). Also, the record shows that files were routinely transferred by Pemex to

storage facilities in which there was no fire (Tr. 4–1–85, p. 170; 1Tr. 6–10–86, pp. 153–154, 173–174), and that there was no fire in Building A–1 where the Purchasing Department was located (Tr. 4–1–85, pp. 168–69).

30. In addition, the evidence showed that numerous copies of records of the type subpoenaed by the defendants were received and prepared, including 7 to 20 copies of bids, and copies of internal memoranda that were addressed to as many as 15 recipients throughout Pemex (see Def.exh. 43). The Purchasing Department, Production Department, Department of Planning and Budget, and Auditing Department all, according to Pemex procedures, received complete files of the bidding contests. (See Def.Exh. 43.) The fire does not satisfactorily explain the absence of the mass of critical documents shown by this record to have existed in various locations throughout Pemex.

31. Based upon the evidence demonstrating the existence of the specifically identified and requested records in the hands of Pemex, the obvious fact that the majority of these records have not been produced even as of this time, and the conduct of Pemex in response to the continued efforts of the defendants and the Court to obtain full compliance with the subpoenas, the Court finds beyond a reasonable doubt that Pemex has failed to comply with the subpoenas of December 1983 and January 1984 and the orders of this Court dated December 30, 1983, January 17, 1984, and July 17, 1984. The Court further finds beyond a reasonable doubt that Pemex has willfully disobeyed these subpoenas and court orders.

32. Crawford defendants have presented an uncontested statement of costs and fees amounting to $79,431.25. The Court finds these costs and fees to be reasonable and necessary in bringing and prosecuting this contempt proceeding.

## II. CONCLUSIONS OF LAW

### A. *Foreign Sovereign Immunity*

1. In its brief filed on the day of the contempt hearing, June 9, 1986, Pemex asserted immunity under the Foreign Sovereign Immunity Act. 28 U.S.C. § 1604. Pemex asserts that it is an agency or instrumentality of the Mexican government under 28 U.S.C. § 1603(a) & (b), and, in fact, has been so interpreted in this district. *See Zernicek v. Petroleos Mexicanos*, 614 F.Supp. 407, 410 n. 4 (S.D.Tex.1985). However, contrary to provisions of Fed.R.Civ.P. 12(b) which states that subject matter jurisdiction is not waivable, foreign sovereign immunity can be waived. 28 U.S.C. § 1605(a)(1).

2. The statute states that foreign sovereign immunity can be waived explicitly or by implication. 28 U.S.C. § 1605(a)(1) . Failure to assert the immunity in a timely fashion has been held to be a waiver by implication. *Richardson v. Fajardo Sugar Co.*, 241 U.S. 44, 47, 36 S.Ct. 476, 477, 60 L.Ed. 879 (1916) (defendant answered and eight months later raised immunity); *Canadian Overseas Ores Ltd. v. Compania De Acero del Pacifico*, 727 F.2d 274, 277 (2d Cir.1984) (filing *motions* in an action does not waive foreign sovereign immunity); *Flota Maritima Browning de Cuba v. Motor Vessel Ciudad*, 335 F.2d 619, 625 (4th Cir.1964) (sovereign immunity is waived when the sovereign enters a general appearance); *Sea Lift Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 601 F.Supp. 457, 465–66 (S.C.Fla.1984) (sovereign immunity waived when not raised until closing argument).

3. The Crawford defendants filed their Motion for an Order to Show Cause on Feburary 13, 1985. Pemex filed a Response on February 21, 1985. On August 22, 1985, the Crawford defendants filed their Motion to Reconvene Pemex Contempt Hearing. On November 18, 1985, Pemex filed a memorandum of authorities in response to the motion to reconvene. In both of Pemex's responses, Pemex chose to defend the charges of contempt on the merits. Neither response raises the issue of foreign sovereign immunity. After very nearly 16 months, Pemex asserted foreign

sovereign immunity at the contempt hearing itself. Pemex's failure to assert immunity when it first responded to Crawford's Motion for an Order to Show Cause, or expressly reserve the right to assert it later, *see Canadian Overseas* at 276, constitutes an implicit waiver of foreign sovereign immunity under 28 U.S.C. § 1605(a)(1) and the cases interpreting that statute.

4. The Second Circuit Opinion in *Canadian Overseas* distinguishes the filing of motions from the filing of responsive pleadings and refuses to hold that the former automatically waives the defense of foreign sovereign immunity. *Canadian Overseas* at 277. Because this contempt proceeding was initiated by the filing of a Motion for an Order to Show Cause, the responsive pleading is not an "answer" as is typical in the waiver cases, *see e.g. Richardson,* but a response to the motion. *Canadian Overseas,* however, does not preclude the finding that the responses filed in this case waive foreign sovereign immunity. In *Canadian Overseas,* the defendant, in lieu of filing an answer, filed a motion for removal, and a motion to dismiss and the court found the defendant reserved its right to assert sovereign immunity in at least three separate documents. *Canadian Overseas* at 276. Before the defendant filed any answer, it filed another motion to dismiss on the grounds of foreign sovereign immunity, and the Fourth Circuit held that it had not waived its right to do so. *Id.* at 276–77. Unlike the defendant in *Canadian Overseas* that never defended the lawsuit on the merits, Pemex immediately addressed the merits of the contempt charge in its response and never challenged jurisdiction. *Canadian Overseas* is clearly distinguishable from this case and cannot be interpreted to preclude the waiver of foreign sovereign immunity by the filing of a response to a Motion for an Order to Show Cause.

5. In addition to Pemex filing responses to the contempt charges without addressing foreign sovereign immunity, counsel for Pemex represented to this court that it did not intend to challenge the jurisdiction of this court. (April, 1985 hearing, Trans. at 42–43.)

6. The Foreign Sovereign Immunity Act also provides for the execution of judgment. 28 U.S.C. § 1610(c); 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3662 (1985). However, the statute only provides for execution upon property in the United States of a foreign state. 28 U.S.C. § 1609, 1610.

7. There has been no evidence that Pemex has any property within the United States upon which the Crawford defendants could execute a judgment in this case if one were rendered for them. However, this Court does recognize the potential property right in the existence of Pemex's civil suit against the Crawford defendants.

### B. *Elements of Criminal and Civil Contempt*

1. The Federal Rules of Criminal Procedure provide that the "[f]ailure of any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued." Fed.R.Crim.P. 17. A court of the United States has the power to punish such contempt. 18 U.S.C. § 401. Criminal contempt is to be prosecuted on notice stating the essential facts constituting the contempt charged. Fed.R.Crim.P. 42.

2. Pemex was given adequate notice of the nature of the proceedings against it in the Motion of Donald G. Crawford and Crawford Enterprises, Inc. to Reconvene Pemex Contempt Hearing and to Impose Sanctions on Pemex for Contempt of Court, filed on August 22, 1985.

3. The Court may allow a private attorney to prosecute a criminal contempt. Fed.R.Crim.P. 42. *Musidor B.V. v. Great American Screen,* 658 F.2d 60, 65 (2d Cir. 1981); *United States ex rel. Vuitton Et Fils S.A. v. McNally,* 519 F.Supp. 185, 186 (E.D.N.Y.1981); *contra Brotherhood of Locomotive Firemen and Engineers v. United States,* 411 F.2d 312, 319 (5th Cir. 1969). The Court in Brotherhood stated, "It is the experience of this Court that the

National Sovereign, through its chosen law officers, should be in control of criminal contempt proceedings." *Brotherhood* at 319. Although the Court in *Brotherhood* made this statement, it did not state that the opinion would modify Rule 42. The actual holding of *Brotherhood* was that the criminal contempt proceedings did not meet the demands of due process as to notice and time. *Id.* at 317–18. A more recent Fifth Circuit opinion declined the opportunity to employ this *Brotherhood* statement. *United States v. McKenzie,* 735 F.2d 907, 910 n. 11 (5th Cir.1984). Therefore, this Court is of the opinion that the court's statment in *Brotherhood* was a mere observation that was inessential to the resolution of the case, and in this particular instance, this Court respectfully declines to incorporate it.

In the case before the Court, counsel for Crawford and Crawford Enterprises, Inc. is most acquainted with the factual underpinnings of the contempt proceeding. Counsel for Crawford also brought a cause of action for civil contempt against Pemex. Both civil and criminal contempt would arise out of the same set of facts. To require a government prosecutor to present facts supporting criminal contempt and a private attorney to present facts supporting civil contempt would be an injudicious use of the court's, government's and the private attorney's time and resources. Therefore, it is entirely proper for a private attorney to prosecute this criminal contempt proceeding.

■ The necessary elements of a conviction for criminal contempt are: (1) a contemptuous act, and; (2) a willful, contumacious or reckless state of mind. *United States v. McCargo,* 783 F.2d 507, 510 (5th Cir.1986). In criminal contempt, these elements must be proven beyond a reasonable doubt. *E.g., Smith v. Sullivan,* 611 F.2d 1050, 1052 (5th Cir.1980). As stated in the Findings of Fact, this Court has found both contumptuous acts and willfulness on the part of Pemex beyond a reasonable doubt.

■ 5. For an action in civil contempt to lie, the court must find a contemptuous act by clear and convincing evidence. *Northside Realty Association, Inc. v. U.S.,* 605 F.2d 1348, 1352 (5th Cir.1979). Willfulness is not an element of civil contempt. *McComb v. Jacksonville Paper Company, et al.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1948). After the movant has shown a prima facie case, the respondent can defend against it by showing a present inability to comply with the subpoena or order. *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). A respondent may not attempt to make a defense in a contempt proceeding based upon inability to comply at the time the initial order was issued. *Id.*

■ Therefore, the court finds respondent Pemex in civil contempt as well. The findings of fact clearly establish contemptuous behavior. (Having found the necessary elements for contempt, it would be a peculiar set of circumstances not to find Pemex in civil contempt as well.) Pemex attempted to show inability to comply with this court's orders by offering testimony regarding a fire at Pemex in 1982. This evidence, however, goes to a past inability to comply, and should have been brought to the Court's attention in the very early stages of discovery. It does not meet the *Rylander* test of evidence going to a present inability to comply. *Id.*

6. It is permissible and often advisable to conduct civil and criminal contempt proceedings together. *United States v. United Mine Workers,* 330 U.S. 258, 299, 67 S.Ct. 677, 698, 91 L.Ed. 884 (1946). Additionally, certain conduct can be found to be both criminally and civilly contemptuous. *Id.* Therefore, this court finds Pemex in both civil and criminal contempt.

## C. *Remedies for Criminal and Civil Contempt*

■ 1. The remedy for criminal contempt is punitive in nature and is imposed for the purpose of vindicating the authority of the court. *United States v. United Mine Workers,* 330 U.S. 258, 302, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947); *In Re Hunt,* 754 F.2d 1290, 1293 (5th Cir.1985); *Smith*

*v. Sullivan,* 611 F.2d 1050, 1053 (5th Cir.1980); *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976). A court of the United States has the power to punish criminal contempt, in its discretion, by fine or imprisonment, 18 U.S.C. § 401. Appropriate considerations for a trial judge assessing a remedy in a case of criminal contempt are the extent of the willful defiance of a court order, the seriousness of the consequences of the violation, the public interest in terminating the defendant's defiance, and the interest in future deterence. *United Mine Workers,* 330 U.S. at 303, 67 S.Ct. at 701. Therefore, the discretion of the trial judge plays a large role in fashioning a remedy. *Id.*

2. The remedy for civil contempt can have two purposes: it can either be coercive or compensatory. *United Mine Workers* at 303, 67 S.Ct. at 701; *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1948); *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976). The court either attempts to coerce the contemnor into compliance with the court's order or attempts to compensate the movant for actual losses sustained due to the contemptuous act. *United States Workers* 330 U.S. at 303–04, 67 S.Ct. at 701.

#### D. *Charactristics of the Present Case*

1. This criminal case, out of which these contempt proceedings arise, is inextricably linked to Pemex's civil case against the Crawford defendants. The two cases arise from the same operative facts, and Pemex seeks to recover damages for the same alleged acts that the government sought conviction. The documents subpoenaed by the Crawford defendants for the defense of the criminal case will also be necessary for the defense of the civil case. This court makes the express finding that Pemex's voluntary invocation of the jurisdiction of this court to pursue a civil remedy cannot be viewed apart from its conduct in the criminal case against the Crawford defendants.

2. The defendants have made the suggestion that an action for civil contempt is moot because the case out of which the contempt proceedings arise has concluded. This Court disagrees for two reasons. First, the authority that defendants refer the court to is limited to coercive remedies, such as imprisoning a contemnor until he ceases the contemptuous behavior. *See e.g., Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); *Harris v. Texas & Pacific Ry. Co.,* 196 F.2d 88, 90 (7th Cir.1952). This is an inherently reasonable proposition, because after the original cause of action has abated, the contemnor has "no further opportunity to purge himself of contempt." *Shillitani,* 384 U.S. at 371, 86 S.Ct. at 1536. However, compensatory remedies for civil contempt do survive the abatement of the cause of action from which it arose. *People's Housing Development Corp. v. City of Poughkeepsie,* 425 F.Supp. 482, 495 (S.D.N.Y.1976). Second, in the unique situation presented here, the rationale in support of the mootness of a coercive contempt remedy is inappliacle. The existence of the civil case, and its similarity to the criminal case in proof and defense does afford a contemnor the opportunity to purge himself of contempt. Further, the criminal and civil cases are so intertwined that the court can conclude that because the civil case is still open, the cause of action out of which the contempt arose is not truly abated. Therefore, this court concludes that a civil contempt proceeding is not moot in any case where compensatory relief is to be the remedy, and in this particular case regardless of whether the remedy is coercive or compensatory.

#### E. *Remedies to be Imposed*

1. Having found Pemex in criminal and civil contempt of this court, the court is faced with fashioning an appropriate remedy. Pemex is a unique contemnor because it is an instrumentality of the state of Mexico. *See Zernicek v. Petroleos Mexicanos,* 614 F.Supp. 407, 410 n. 4 (S.D.Tex.

1985). Although Pemex has waived foreign sovereign immunity, the court and the parties believe that a judgment could not be executed against Pemex in Mexico. April 1985 Hearing, Trans. at 42–43. *See* 28 U.S.C. §§ 1609, 1610 (providing only for execution against property of a foreign state in the United States). As a corporation, Pemex obviously cannot be imprisoned. For these reasons, the Court is severely impaired in fashioning a meaningful remedy to vindicate the authority of this court, coerce Pemex into complying with the Court's orders, and compensate the Crawford defendants. Pemex's civil cause of action in this Court is a potential property interest in the United States and, therefore, the court believes that the only meaningful way for it to obtain compliance with its orders and vindicate its authority is to threaten the viability of that cause of action. Pemex has voluntarily invoked the jurisdiction of this Court and expects the Court to fairly adjudicate its claim against Crawford. This Court is extremely reluctant to permit Pemex to prosecute its lawsuit when it has so flagrantly disobeyed this Court in the past and so drastically impeded the full defense of the criminal charges against the Crawford defendants. The Court will not permit Pemex to continue to abuse the authority of this Court and deprive the Crawford defendants of the defenses to which they are entitled in order to further Pemex's own financial interests.

2. Therefore, in accordance with an accompanying order, Pemex shall either produce each and every document referred to in the subpoenas of December 1, 1983 and January 13, 1984 and movant's Exhibit 44 that have not yet been produced, or explain in detail why each document cannot be produced, within sixty (60) days of the execution of the order, or this court will dismiss Pemex's civil action H–83–6418 with prejudice. The court will *not* accept as an explanation for a missing document that it was destroyed in a fire because, as stated above, the court does not find the testimony regarding the fire credible, and also found that copies of documents existed elsewhere in Pemex offices. Explanations for documents that cannot be produced must be detailed, precise, in writing and in English. A response that a document is "missing" or a similarly terse and non-descriptive response will not suffice. If a document cannot be found, Pemex in its response should explain its document copying, microfilming, filing, and storage system(s): in other words, how many copies of certain documents are made, who gets copies, which documents are microfilmed, how copies of documents and microfilms are filed, where they are filed and where they are ultimately stored. In conclusion, an explanation for a document that is not produced must include all the locations where the missing document should be according to Pemex's system(s) listed above, that all those locations were thoroughly searched, that all persons responsible, in possession or persons who had access to the document were questioned and, finally, why the document is unavailable. This production shall be conducted at Pemex's expense.

3. For the purpose of facilitating the production process and the court's overseeing of it, Philip T. Evans, paralegal in the employ of Miller, Cassidy, Larroca & Lewin, shall be appointed a Special Master, in accordance with Fed.R.Civ.P. 53. The Court finds Mr. Evans to be the person most familiar with both the documents produced in this case and the documents not yet produced. Mr. Evans' powers shall consist of and be limited to the collection of documents and/or explanations for documents produced in accordance with this order, comparison of the production with the two subpoenas and Exhibit 44, and preparation of a report to be filed with this court on the compliance with this order. The report should include, as exhibits, any explanations offered by Pemex for documents that are not produced. Mr. Evans' report should also include an accounting of the time expended in connection with his duties as Special Master, any expenses incurred, and a statement of a fair and adequate hourly fee commensurate with fees charged by similarly skilled paralegals in the Washington D.C. area. After the court

has reviewed such expenses, Pemex shall be required to reimburse the Special Master or his firm an amount ordered by the Court.

4. For Pemex to purge itself fully of its contempt, it must reimburse the Crawford defendants and/or their law firm for the time and expenses incurred in bringing and prosecuting these contempt proceedings. Therefore, this accompanying order additionally will assess costs and fees against Pemex in the amount of $79,431.25 in the form of a compensatory fine to be paid within 60 days of the date of the order. Absent such payment, Pemex will be in further contempt and an additional appropriate remedy shall be assessed.