826 F.2d 392
 9 Fed.R.Serv.3d 202
 PETROLEOS MEXICANOS, Plaintiff-Appellant,
v.
CRAWFORD ENTERPRISES, INC., and Donald G. Crawford, et al.,
Defendants- Appellees.
and
UNITED STATES of America, Plaintiff,
v.
CRAWFORD ENTERPRISES, INC., and Donald G. Crawford, et al.,
Defendants- Appellees,
v.
PETROLEOS MEXICANOS, Appellant.
 Nos. 86-2750, 86-2751.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 10, 1987.
 
 Kenneth R. Wynne, Alfredo R. Perez, Bracewell & Patterson, Houston, Tex., for plaintiff-appellant.
 Kirkland & Ellis, James P. Cusick, Chicago, Ill., for IHC.
 William H. Jeffress, Jr., Steve Braga, Herbert J. Miller, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Crawford, et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GEE, JOHNSON and HILL, Circuit Judges.
 ROBERT MADDEN HILL, Circuit Judge:
 
 
 1
 Petroleos Mexicanos (Pemex) appeals from an order of the district court finding Pemex in civil and criminal contempt of the court's orders and subpoenas. Pemex has allegedly failed to comply with the court's discovery orders and subpoenas, seeking the production of Pemex documents, issued in the criminal prosecution of Crawford Enterprises, Inc., and Donald G. Crawford. For the reasons stated below, we affirm in part and dismiss in part.
 
 I.
 
 2
 On October 2, 1982, Crawford Enterprises, Inc., Donald G. Crawford (collectively Crawford), and six other individuals were indicted for multiple violations of the Foreign Corrupt Practices Act, 15 U.S.C. Sec. 78dd-2. The indictment alleged that Crawford and the other individuals had bribed certain officials of Pemex, the national oil company of Mexico, in order to obtain several multi-million dollar equipment contracts with Pemex. Crawford initially entered pleas of not guilty and denied any knowledge of improper payments to Pemex officials. In its defense Crawford claimed that the contracts had been awarded on the basis of Pemex's own competitive bidding process; that Pemex possessed documentation that would reflect this process; and that Crawford and the other defendants had been awarded the contracts because their bids were superior, not because of improper influencing of Pemex officials.
 
 
 3
 In October 1983, while the criminal proceeding against Crawford and the other defendants was pending in the Southern District of Texas, Pemex initiated a civil suit in the same district against Crawford and others. In its complaint Pemex sought several million dollars in both compensatory and punitive damages from Crawford and the other entities based upon the same conduct that was alleged in the criminal indictment. Pemex's suit was premised upon alleged violations of the Sherman Antitrust Act, 15 U.S.C. Sec. 1 et seq.; the Robinson-Patman Act, 15 U.S.C. Secs. 13(c), 14; and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 et seq. Pemex also asserted causes of actions based upon commercial bribery and common law fraud.
 
 
 4
 During the latter part of 1983, Crawford began its efforts to obtain the documents from Pemex that it claimed would be crucial to a defense of both the criminal and civil cases. In August 1983 Crawford persuaded the district court to send letters rogatory to Pemex requesting that it produce procurement, bidding process, and purchase order documentation relevant to the pending criminal matters. Four months elapsed and Crawford received no response from Pemex. Since the criminal proceeding was apparently moving toward an early trial, Crawford requested that the district court issue a subpoena directing Pemex to produce the documentation necessary for Crawford's defense. Pemex responded to this request by moving for a protective order claiming that the production request would be unduly burdensome. On December 20, 1983, the district court after a hearing on Crawford's request, issued a subpoena, pursuant to Fed.R.Crim.P. 17(c), directing production of several different categories of documents, including purchase orders, bid analyses, and procurement recommendations. The court ordered the production of the documents by February 6, 1984.[1]
 
 
 5
 Between January and April 1984 Pemex produced several thousand pages of documents mostly from its files in a Houston office. While many of the documents were responsive to the subpoena, the key documents involving the procurement and bidding process were noticeably absent. Crawford's counsel informed Pemex in two separate letters that the key documents had not been produced and requested that they be produced or an explanation given as to why they were not. Pemex did not respond to these letters. Faced with Pemex's lack of response, in June 1984 Crawford filed a motion to compel further compliance with the subpoenas. In its motion Crawford specified the types of documents not yet produced by Pemex and why they were important to Crawford's defense in both the criminal and civil action. Pemex filed no response to this motion. On July 17 the district court granted the motion and again ordered Pemex to "comply without further delay with this Court's previous order to produce all documents specified in the attachment to [Crawford's] Rule 17(c) subpoenas." From this date until February 1985, however, Pemex produced no further documents nor did it supply any reason why it did not respond or act.[2]
 
 
 6
 With the criminal trial set for April 8, 1985, Crawford made a final effort to obtain the documents requested in the prior subpoenas and court orders. Crawford moved for an order for Pemex to show cause why it should not be held in contempt for failing to comply with the subpoenas and orders of the district court. Pemex opposed this motion by asserting that it had produced all of the subpoenaed documents in its possession that it had uncovered. Pemex also suggested that any failure to produce relevant documents should be attributable to the possibility that Crawford was involved with former Pemex employees in "covering their tracks." An order to show cause was issued by the district court on March 21, 1985.[3]
 
 
 7
 A hearing on the show cause motion was held on April 1, 1985. Crawford presented testimony and exhibits showing that the key documents they sought were prepared in the general course of Pemex's business and were usually retained in Pemex's file, that these documents were crucial to Crawford's defense in the criminal action and in Pemex's civil action, and that many of these key documents which had been specifically requested in the subpoenas had not been produced.[4] In response Pemex had witnesses testify that a search for relevant documents had been performed by Pemex officials, but on cross-examination the witnesses admitted to not having personal knowledge of the fact or scope of any search for the key documents. Pemex also asserted that a fire in 1982 had destroyed many of the documents sought by the subpoenas. While indicating that it believed at this point that Pemex had willingfully failed to comply with the court's orders, the district court did not hold Pemex in contempt, but directed Crawford to submit by the next day, April 2, a specific list of documents it needed and ordered Pemex to produce these documents by April 15.[5] Apparently thinking that it had finally resolved the discovery dispute, the district court adjourned the contempt hearing "without prejudice to the entry at a later date of an order imposing sanctions upon Pemex for failure to comply with this order and previous orders of this Court." On April 2 Crawford submitted the list ordered.
 
 
 8
 On April 4, 1985, Crawford entered pleas of nolo contendere to the indictment specifically noting that they did so in part because they did not have the necessary documents to prepare their defense. On April 29 Pemex produced 2,731 pages of documents that were especially favorable to Crawford. In particular, Pemex produced an internal Pemex analysis of its contract procurements between 1977-79 (years covered within the indictment) that reflected the number of bidders on each contract, the amount of the bids, the specific promises made by the bidders, as well as explanations of why the winning bidder was chosen. Several key documents described in the subpoenas however were still not forthcoming from Pemex. Based upon Pemex's continued failure to produce key documentation, Crawford moved to reconvene the contempt hearing in August 1985, requesting that Pemex be held in both civil and criminal contempt of court.[6] The district court granted the request, and another hearing was finally scheduled for June 1986.[7]
 
 
 9
 At the June 1986 hearing Crawford again presented evidence that the documents that had been so reluctantly surrendered to date by Pemex and the ones that had yet to be disclosed were documents ordinarily produced and kept by Pemex officials. Crawford also established that several of the documents had multiple copies and should be available from several sources within Pemex. Pemex sought to explain its failure to produce documents and its incremental disclosure of some documents. Pemex presented two officials who stated that a "good faith" effort had been made to discover the necessary documents. Both Pemex witnesses however explained that the documents had recently been discovered in a file cabinet in the office of one of the witnesses that had been previously searched. Pemex also attempted to explain its lack of production because of a fire at a Pemex filing office. Crawford countered on cross-examination by bringing out the fact that many of the documents (or copies of them) sought by the subpoenas and court orders were stored in buildings in which no fire had occurred.
 
 
 10
 At the close of the evidence, the district court entered detailed findings of fact and conclusions of law. It found by clear and convincing evidence that the documents produced on April 29 and November 26, 1985 (with the exception of one document obtained from an outside engineering firm) did exist in Pemex's files in December 30, 1983, and continuously thereafter; that the documents were plainly called for by the subpoenas and court orders of December 30, 1983, and January 17 and July 17, 1984; that a conscientious search conducted in good faith would have located those documents; and that Pemex either did not search the files in good faith, or did not produce the documents when located. The court further found that the nonproduction served Pemex's interest in hindering Crawford's ability to defend against criminal charges very similar to the civil complaint being pursued simultaneously by Pemex against Crawford; that the documents were finally produced only after the Crawford defendants, after great expenditure of time and money, had proved their existence in open court and that certain testimony by Pemex representatives as to the purported reasons for nonproduction of the documents prior to April 29, 1985, was not credible. The court further found that neither the fire nor any other explanation satisfactorily explained the absence of other records which remained unproduced at the time of the hearing. Based upon these factors and the entire record of the proceedings before it, the district court found beyond a reasonable doubt that Pemex's failure fully to comply with the subpoenas and court orders was willful and inexcusable. On September 3, 1986, the court entered an order adjudging Pemex guilty of both criminal and civil contempt. 643 F.Supp. 370.
 
 
 11
 In fashioning a remedy for Pemex's contempt, the district court ordered Pemex to pay to Crawford or its legal representative a compensatory fine of $79,431.25, representing the reasonable and necessary costs and fees in bringing the contempt action and in attempting to secure the discovery sought by the subpoenas. The court also rejected Pemex's belated claim of sovereign immunity, its claim of lack of notice as to criminal contempt,[8] its contention that criminal contempt could not be prosecuted by private attorneys, and its claim of mootness. The court did not impose any sanctions for criminal or civil contempt other than the award of costs and fees. It found, however, that the criminal case against Crawford and the related Pemex civil action against Crawford and others were "inextricably linked," and that "Pemex's voluntary invocation of the jurisdiction of this court to pursue a civil remedy cannot be viewed apart from its conduct in the criminal case against the Crawford defendants." It further found that Pemex's civil case was a "property interest" of Pemex within the United States, and that "the only meaningful way for [the court] to obtain compliance with its orders and vindicate its authority is to threaten the viability of that cause of action."
 
 
 12
 Rather than dismiss Pemex's civil action as requested by Crawford, however, the district court permitted Pemex another further opportunity to produce the missing documents or satisfactorily explain their absence. Pemex was given 60 days to produce the documents or supply explanations, and the court appointed a paralegal, Philip Evans, employed by the law firm representing Crawford, as a Special Master for the purpose of "facilitating the production process and the court's overseeing of it."[9] The court in its order further stated: "If Pemex fails to comply with this order within sixty (60) days or responds unsatisfactorily, the Court will dismiss Pemex's Civil Action H-83-6418 with prejudice." (emphasis in original.)
 
 
 13
 Pemex immediately appealed the September 3, 1986, contempt order to this court.
 
 II.
 
 14
 Several issues are raised by the appeal. We see the principal questions as follows: (1) Are the findings of civil and criminal contempt final and appealable? (2) Is there sufficient evidence to support the district court's finding of civil contempt against Pemex? (3) Did the district court err in threatening to dismiss Pemex's civil action? and (4) Did the district court err in appointing a paralegal in the law firm representing Crawford as a special master to monitor Pemex's discovery compliance? We turn now to answering the above queries.
 
 A.
 
 15
 As an initial matter we must examine our jurisdiction over Pemex's appeal of the civil and criminal contempt findings made by the district court.[10] In doing so we address two questions: (1) are the civil and/or criminal contempt decisions of the district court final and appealable? and (2) if the civil contempt decision is final and appealable, is it moot?
 
 1.
 
 16
 In this case the district court conducted the civil and criminal contempt proceedings together. Such a practice is permissible. See United States v. United Mine Workers, 330 U.S. 258, 299, 67 S.Ct. 677, 698, 91 L.Ed. 884 (1946). The district court found Pemex to be in both criminal and civil contempt of the court's prior orders and subpoenas in the criminal action. In structuring a remedy the court threatened to dismiss Pemex's civil action and imposed "a compensatory fine" of $79,431.25 in favor of Crawford for its costs and expenses incurred in bringing and prosecuting the contempt hearings.
 
 
 17
 As a general rule an adjudication of civil contempt is final and appealable as to a non-party such as Pemex. See McCrone v. United States, 307 U.S. 61, 65, 59 S.Ct. 685, 687, 83 L.Ed. 1108 (1939); Southern Railway Co. v. Lanham, 403 F.2d 119, 124 (5th Cir.1968), reh'g denied, 408 F.2d 348 (5th Cir.1969). Also as a general rule, an adjudication of criminal contempt is a final judgment and the contemnor, whether party or non-party, may obtain immediate appellate review. See Union Tool Co. v. Wilson, 259 U.S. 107, 109, 42 S.Ct. 427, 428, 66 L.Ed. 848 (1922); Southern Railway, 403 F.2d at 124. Under both of these general rules a contempt decision's finality and appealability is composed of two parts: (1) a finding of contempt, and (2) an appropriate sanction for that contempt. See Nasco, Inc. v. Calcasieu Television & Radio, Inc., 752 F.2d 157, 159 (5th Cir.1985) (appealable adjudication of contempt must entail both a finding and sanction); United States v. Hankins, 565 F.2d 1344, 1352 (5th Cir.1978) (criminal contempt finding not appealable without sanction); see also Motorola, Inc. v. Computer Displays Int'l, 739 F.2d 1149, 1154 (7th Cir.1984) (a civil contempt decision is final only "if it includes both a finding of contempt and the imposition of a sanction.") (emphasis in original); Weyerhaeuser Co. v. Int'l Longshoremen's Union, 733 F.2d 645, 645 (9th Cir.1984) (a criminal contempt order not appealable because no sanction imposed).
 
 
 18
 In this case the district court explicitly found Pemex to be in both criminal and civil contempt, thus the first prong of the finality requirement is satisfied as to both decisions. The difficulty arises as to whether the second prong is satisfied for either or both findings. The threat to dismiss Pemex's civil action cannot serve as a sanction for either the civil or criminal contempt finding because it is simply an unfulfilled statement of possibility. We turn then to the $79,431.25 fine.
 
 
 19
 Our task of course is to decide whether this fine was meant to be a civil or criminal contempt sanction. In carrying out this duty, we are guided by the general test of discerning the trial court's apparent purpose for levying the judgment of contempt. See Thyssen, Inc. v. S/S CHUEN ON, 693 F.2d 1171, 1172 (5th Cir.1982); Smith v. Sullivan, 611 F.2d 1050, 1053 (5th Cir.1980); Lewis v. SS BAUNE, 534 F.2d 1115, 1119 (5th Cir.1976). Additionally, we are guided by the principle that "[s]entences for criminal contempt are punitive in their nature and are imposed primarily for the purpose of vindicating the authority of the court." United States v. Rizzo, 539 F.2d 458, 462 (5th Cir.1976) (citing United States v. United Mine Workers, 330 U.S. 258, 302, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947)). In contrast, sanctions for civil contempt are meant to be "wholly remedial" and serve to benefit the party who has suffered injury or loss at the hands of the contemnor. See Southern Railway, 403 F.2d at 124.
 
 
 20
 Applying these standards to the court's award of $79,431.25 to Crawford, we believe it is best considered a sanction for civil contempt. The court specifically described the fine as "compensatory" and intended to remedy Crawford's expenses in dealing with Pemex's recalcitrant actions.[11] The sanction also runs only in favor of a private party, Crawford, rather than the court or the United States, and thus is comparable to civil contempt sanctions imposed in other cases. E.g., Northside Realty Associates v. United States, 605 F.2d 1348, 1356 n. 22 (5th Cir.1979). Furthermore, payment of the sanction would allow Pemex to purge itself of contempt, a fact that in the past we have considered to cut in favor of classifying a sanction as civil in nature rather than a punitive criminal one. See Southern Railway, 403 F.2d at 125. Finally, after reviewing the record and the district court's findings of fact and conclusions of law it is apparent to this court that the fine was intended to be the civil contempt sanction in this case. Our conclusion is bolstered by the fact that the district court was considering dismissing Pemex's civil case as the appropriate "punishment" for its prior actions. It thus appears that the punitive sanction was to be the dismissal rather than the fine.
 
 
 21
 For the above reasons, we conclude that the civil contempt decision is final and appealable because there is a finding of contempt and a concomitant sanction. As for the criminal contempt decision, we must conclude that it is not final because no sanction for criminal contempt has been imposed. See Flanagan v. United States, 465 U.S. 259, 263, 104 S.Ct. 1051, 1053, 79 L.Ed.2d 288 (1984); see also Hankins, 565 F.2d at 1352. Accordingly, we must dismiss this portion of Pemex's appeal.[12]2.
 
 
 22
 Pemex contends that it was wrongfully held in civil contempt because the contempt action was mooted when the criminal case in which it allegedly committed contempt ended. We disagree.
 
 
 23
 The government's prosecution of Crawford ended on July 11, 1985, when it was sentenced pursuant to its nolo contendere plea to the indictment. Pemex was held to be in civil contempt in September 1986. Whether this action of holding Pemex in civil contempt for its actions and inactions in the criminal prosecution which ended in July 1985 was proper depends largely upon the nature of the civil contempt remedy sought from the district court.
 
 
 24
 Civil contempt can serve two different purposes. On one hand, civil contempt is used to enforce, through coerciveness, compliance with a court's order. On the other hand, civil contempt can be used to compensate a party who has suffered unnecessary injuries or costs because of the contemptuous conduct. See Shillitani v. United States, 384 U.S. 364, 370-71, 86 S.Ct. 1531, 1535-36, 16 L.Ed.2d 622 (1966); United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); In re Hunt, 754 F.2d 1290, 1293 (5th Cir.1985); Smith v. Sullivan, 611 F.2d 1050, 1053 (5th Cir.1980); United States v. Rizzo, 539 F.2d 458, 463 (5th Cir.1976).
 
 
 25
 If the civil contempt proceeding is coercive in nature, the general rule is that it is mooted when the proceeding out of which it arises is terminated. See Shillitani, 384 U.S. at 371, 86 S.Ct. at 1536; Howell v. Jones, 516 F.2d 53, 56 (5th Cir.1975). If, however, the civil contempt proceeding is compensatory in nature, the termination of the underlying action out of which the contempt hearing arose does not moot the contempt proceeding. See Backo v. Local 281, United Brotherhood of Carpenters & Joiners, 438 F.2d 176, 182 (2d Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1970); see also People's Housing Development Corp. v. City of Poughkeepsie, 425 F.Supp. 482, 495 (S.D.N.Y.1976) ("There is a vital distinction between coercive contempt proceedings, which do not survive the abatement of the original actions out of which they arise, and compensatory contempt proceedings, which do survive."). This distinction rests upon the fact that the harm or injury that gives rise to the need for compensation continues unredressed at the end of the underlying litigation while the need for getting a party to act in the underlying litigation necessarily terminates when that litigation ends.
 
 
 26
 In this case the purpose of the April 1985 and June 1986 contempt hearings encompassed both coercive and compensatory purposes. As for the contempt fine of $79,431.25, we have already held that it served to compensate Crawford for the costs it incurred in attempting to obtain discovery from Pemex. Based upon the above-mentioned legal principles we are of the opinion that the compensatory purposes of the contempt hearings were not mooted by the termination of the underlying criminal prosecution.
 
 
 27
 Furthermore, we would be obliged to reject Pemex's mootness argument even if we did not distinguish between coercive and compensatory contempt purposes. Under the circumstances of this case the criminal prosecution and the civil action are so closely related that Pemex's mootness argument must fail since Pemex's civil action continues. We agree with the district court's finding that
 
 
 28
 in the unique situation presented here, the rationale in support of the mootness of a coercive contempt remedy is inapplicable. The existence of the civil case, and the similarity to the criminal case in proof and defense does afford a contemnor the opportunity to purge himself of contempt. Further the criminal and civil cases are so intertwined that the court can conclude that because the civil case is still open, the cause of action out of which the contempt arose is not truly abated.
 
 
 29
 Thus, under the unique circumstances of this particular case, the ability to structure a contempt remedy, whether termed coercive or compensatory, was not moot because the on-going civil action was so intertwined with the terminated criminal prosecution that relief could properly be granted in the civil case for improprieties committed by Pemex in the criminal proceeding.
 
 
 30
 Accordingly, we reject Pemex's argument that the opportunity to determine civil contempt and structure a remedy for it was mooted by the termination of the criminal prosecution.
 
 B.
 
 31
 Pemex argues that there is insufficient evidence to support the district court's finding that Pemex was in civil contempt. Pemex also claims that it in good faith attempted to comply with the court's orders and subpoenas and, citing United States v. Rizzo, 539 F.2d 458 (5th Cir.1976), argues that its good faith is a defense to a civil contempt action.
 
 
 32
 The movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); Northside Realty, 605 F.2d at 1352. Willfulness is not an element of civil contempt. Id. at 1352. After the movant has shown a prima facie case, the respondent can defend against it by showing a present inability to comply with the subpoena or order. See United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983).
 
 
 33
 The district court filed extensive findings of fact which we attach in the Appendix. These findings encompass all of the above elements and defenses. We measure the competency of those findings with the clearly erroneous rule of Fed.R.Civ.P. 52. See also Anderson v. City of Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).[13] Our review of the record and the hearing transcripts reveal that each of the district court's findings are well-supported and certainly not clearly erroneous. Those findings support the district court's decision of civil contempt on the part of Pemex. In particular in finding 26 the court specifically finds that Pemex did not act in good faith, thus nullifying Pemex's asserted good faith defense. Accordingly, we express no opinion on the existence or availability of such a defense.
 
 
 34
 For these reasons we affirm the district court's finding that Pemex was in civil contempt of court.
 
 C.
 
 35
 Pemex also challenges the district court's threat to dismiss its civil case. As we have already stated, the propriety of dismissing Pemex's civil suit as a punitive sanction for criminal contempt is not ripe for decision at this time. See supra II A(1); see also 15 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3915, at 266 (1986) (mere indications that district court may enter specific orders in the future are plainly nonfinal and not ripe for review). Accordingly, we decline Pemex's invitation to address this matter.
 
 D.
 
 36
 The final issue raised by Pemex involves the district court's appointment of a paralegal in the law firm representing Crawford as a special master to review further disclosures Pemex was ordered to make. Pemex claims that the appointment was improper because the paralegal was associated with Crawford's law firm.
 
 
 37
 As an initial matter our review of the record does not reveal that Pemex raised this contention in the district court. Accordingly, we have held that we can decline to review such an assertion when raised for the first time on appeal. See Alberti v. Klevenhagen, 790 F.2d 1220, 1229 (5th Cir.), reh'g denied, 799 F.2d 992 (5th Cir.1986). However in the interest of judicial economy, we note our language from Lister v. Commissioners Court of Navarro County, 566 F.2d 490, 493 (5th Cir.1978):
 
 
 38
 A special master "should have no interest in or relationship to the parties ... and [should be] fit to perform the duties incumbent on one sitting in the place of the court." A special master has the duties and obligations of a judicial officer. Having served as a witness for one side of the case, the appointee was accordingly disqualified.
 
 
 39
 Philip Evans, the paralegal appointed by the court, did serve as a witness in the contempt hearing for Crawford. Under Lister's language he is disqualified to serve as a special master.
 
 
 40
 Much of what Evans was appointed to do, however, was to mechanically file and index the various document productions.[14] The district court should not be forced to redo all of Evans' work to the extent that it was purely mechanical. Therefore, in the continuing proceedings before the district court, it would be appropriate for the district court to vacate the order of reference to the special master and to carefully review the mechanical work and to disregard any of Evans' opinion or judgment about the state of Pemex's compliance. The district court is free to appoint a disinterested master to aid in monitoring Pemex's compliance with the court's orders, if it so chooses.
 
 III.
 
 41
 For the above reasons, we AFFIRM the district court's order of September 3, 1986, of adjudication of civil contempt against Pemex. Further, we DISMISS Pemex's appeal of the district court's order of September 3, 1986, finding Pemex in criminal contempt, because the finding is not final and appealable.
 
 
 42
 AFFIRMED IN PART and DISMISSED IN PART.
 
 APPENDIX
 FINDINGS OF FACT
 A. Background of Subpoenas
 
 43
 1. Defendants Crawford Enterprises, Inc. (CEI) and Donald G. Crawford (movants herein) were charged by an indictment filed October 2, 1982, with multiple violations of the Foreign Corrupt Practices Act. In essence, the indictment charged that CEI and Crawford had obtained contracts for the multi-million dollar purchase of gas compression equipment from Petroleos Mexicanos (Pemex) during 1977-79 through bribery of certain Pemex officials.
 
 
 44
 2. The defendants denied knowledge of any improper payments to Pemex officials, and vigorously contended that the awards of contracts were made in full compliance with the Pemex competitive bidding process; that the defendant's offers were superior to those of all other bidders taking into consideration the equipment offered, the price, and the promised delivery dates; and that the technical staff of Pemex's purchasing and production departments recommended the awards to the defendants after consideration of all bids on their merits.
 
 
 45
 3. The documents necessary for the defendants to prove their defense at trial could be found only in the files of Pemex, located principally in Mexico City. Pemex, an instrumentality of the Mexican government, was cooperating with the United States Justice Department in the investigation and prosecution of these defendants. Thus, voluntary cooperation from Pemex was not easily obtained.
 
 
 46
 4. Judge George C. Cire (now deceased), before whom the criminal trial was pending, on the defendants' motion, issued letters rogatory to Pemex on August 5, 1983, seeking production of documents relating to the procurements specified in the indictment, other procurements on which the defendants submitted bids (both successfully and unsuccessfully), Pemex purchasing procedures, and other matters. By December 1983, with the scheduled trial less than two months away, no response had been received from Pemex to the letter rogatory.
 
 
 47
 5. In the meantime, on October 26, 1983, Pemex filed a civil action in this Court against C.E.I., Mr. Crawford and others seeking recovery of some $135 million in alleged damages based upon allegations similar to those in the pending indictment. That civil action remains pending at this time.
 
 
 48
 B. The Subpoenas and the Orders Compelling Compliance
 
 
 49
 6. On December 1, 1983, C.E.I. and Crawford served upon Pemex, pursuant to leave of Court granted under Rule 17(c), Federal Rules of Criminal Procedure, a subpoena duces tecum requiring production of the same materials earlier sought by the letter rogatory. Pemex moved for a protective order on the ground, inter alia, that compliance would be unduly burdensome. The motion was heard by Judge Cire on December 20, and was granted only to the extent that the time for compliance was enlarged. By order dated December 30, 1983, Judge Cire directed: "All the requested documents shall be produced by Monday, February 6, 1984. Pemex shall produce the documents as they become available."
 
 
 50
 7. On January 13, 1984, the defendants (again with leave of court) served upon Pemex a supplemental subpoena duces tecum seeking six additional categories of documents. Another order was entered by Judge Cire on January 17, 1984, directing full compliance with both subpoenas through production of the offices of Pemex's local attorneys in Houston, with copying to take place at the defendants' expense.
 
 
 51
 8. Between January and April, 1984, Pemex produced thousands of pages of documents, primarily from Pemex's Houston office, in response to these two subpoenas and court orders. The bulk of these documents, while responsive to certain paragraphs of the subpoena, did not concern the critical bidding process. A lesser number of documents were produced from the Mexico City office of Pemex, including a small number of documents concerning the biddings. On March 6 and 8, 1984, defense counsel served Pemex's attorneys with letters detailing the documents which had been subpoenaed but not produced by Pemex, including most of the critical bid documentation.
 
 
 52
 9. During the following six weeks, Pemex supplied further documents which were again reviewed and analyzed by the defense staff, but the requests for the bidding and award documents again were largely unfulfilled. By letter to Pemex's counsel dated May 2, 1984, defense counsel detailed the limited production made since the letter of March 6 and 8, and again demanded the missing documents. The letter further stated:
 
 
 53
 In the event that any of the requested documents no longer are in Pemex's possession, custody or control, please indicate whether they were (i) removed from Pemex's files without Pemex's authorization, and if so when and by whom, (ii) transferred to another agency or division within the Mexican government, or (iii) destroyed, either by fire or otherwise.
 
 
 54
 10. Following receipt of this letter, Pemex produced no further documents responsive to the December and January subpoenas, nor did it respond to the request for explanation of the missing documents contained in the May 2 letter. Accordingly, the defendants filed on June 8, 1984, a Motion to Compel Pemex to Comply with Court-Ordered Production. Pemex did not respond to this motion in any manner whatsoever.
 
 
 55
 11. On July 17, 1984, Judge Cire granted the defendants' motion and once again ordered "that Pemex comply without further delay with this Court's previous order to produce all documents specified in the attachment to defendants' Rule 17(c) subpoenas." Pemex did not produce any further documents in response to this order, nor did it serve or file any accounting of the reasons for the absence of the unproduced documents.
 
 
 56
 12. When Judge Cire became critically ill, Chief Judge John V. Singleton transferred the criminal case to his docket and continued to preside over it. After Judge Cire's death Judge Singleton also transferred the civil case to his docket.
 
 
 57
 C. The Order to Show Cause and the Order of April 2, 1985
 
 
 58
 13. The trial date of the criminal case against C.E.I. and Crawford, having been continued while the government took an interlocutory appeal to the Fifth Circuit from a pretrial order, was ultimately rescheduled to begin April 8, 1985. On February 13, 1985, the defendants, in a final effort to obtain the documents necessary to their defense, moved for an order to show cause why Pemex should not be held in contempt. Pemex opposed the motion, asserting that it had produced all the subpoenaed records in its possession, custody or control, and giving as the explanation for its "incomplete" documentation the following: "The only inference which can be drawn by the state of Pemex's documentation is that Crawford was somehow involved with the former Pemex employees in 'covering their tracks.' "
 
 
 59
 14. An Order to Show Cause was issued by this Court on March 13, 1985, and the hearing began on April 1, 1985. At this hearing, Pemex's counsel stated:
 
 
 60
 What our evidence will be is not that every document that ever existed responsive to the descriptions in those subpoenas have been produced, but rather every blessed one that we can find now after the most diligent thorough kind of search possible has been produced.
 
 
 61
 Pemex claimed at the April 1 hearing, for the first time in the record of these proceedings, that a substantial number of the requested documents had been destroyed by fire in 1982, and repeated the contention that documents may have been removed from Pemex's files without authorization.
 
 
 62
 15. At the hearing, the movants offered evidence through the testimony of John Sherman and Philip Evans, and the exhibits admitted in evidence, that (1) it was the custom and practice of Pemex to receive or prepare and to retain the types of procurement records specified in the subpoenas; (2) that these records were material to the defense of the criminal case (as well as pemex's separate civil action); and (3) that the vast majority of the subpoenaed documents relating to the procurements at issue in the indictment, and others on which the defendants had submitted successful or unsuccessful bids, had not been produced, nor had any satisfactory reason been given for their absence. In addition, the movants identified specific Pemex documents--obtained by them from court records in Mexico, from discovery provided by the United States government, and from other sources--which demonstrated concretely that responsive and highly material and exculpatory records did exist in the files of Pemex that were not produced in response to the subpoenas and court orders at issue.
 
 
 63
 16. With the concurrence of Pemex's counsel, the hearing was adjourned and the movants were directed to supply a narrowed list of the previously subpoenaed but unproduced documents considered most critical to the defense of the criminal case. On April 2, such a list was provided, and the court entered an order finding that Pemex had failed to produce all subpoenaed documents, directing that those specified on the narrowed list be produced by April 15 (later extended to April 29), and continuing the contempt hearing until further notice "without prejudice to the entry at a later date of an order imposing sanctions upon Pemex for failure to comply with this order and previous orders of this Court."
 
 
 64
 17. On April 4, 1985, defendants Crawford and C.E.I. entered pleas of nolo contendere to the indictment. The order to Pemex, however, was undisturbed, as the criminal case remained pending until such time as judgments were entered upon the pleas.
 
 
 65
 18. On August 22, 1985, the Crawford defendants filed a motion to reconvene the contempt proceedings. This motion was granted by the Court on September 3, 1985, and the reconvened hearing began on June 9, 1986. The findings below are made based on evidence heard during the reconvened hearing.
 
 
 66
 D. The Supplemental Production of Documents on April 29,
 
 1985
 
 67
 19. On April 29, 1985, Pemex produced to the defendants some 2,731 pages of additional documents. Many of these were responsive to the order of April 2; all had been called for under subpoenas served fourteen to fifteen months earlier. While many of these documents were relevant and exculpatory, the most striking example was an analysis of Pemex gas compression procurements between 1977-79 (the years covered by the indictment), which reflected the number of bidders on each requisition, the prices offered, the delivery dates promised, and the basis upon which the winning bidder was selected, as well as other pertinent information.
 
 
 68
 This document was never produced by Pemex until after Pemex faced the likelihood of contempt sanctions, after the defendants on April 1 proved the likely existence of the document, and after the defendants had entered pleas of nolo contendere to the criminal charges.
 
 
 69
 20. The April 29 production by Pemex, supplemented by production on November 26, 1985, of another four documents specifically described in the April 2 order, still left unproduced, however, the majority of documents which even Pemex's witnesses conceded to be the types of records customarily prepared in connection with the gas compression procurements at issue. Indeed, a complete set of the bidding contest records--which Pemex procedures required to be submitted to no fewer than three separate departments of Pemex--was produced on only one purchase order, and this was a job on which C.E.I. was not the successful bidder.
 
 
 70
 E. Pemex's Explanations for Nonproduction of the April 29
 
 Documents
 
 71
 21. The production by Pemex, under threat of contempt sanctions, of the 2,731 pages of documents produced April 29, 1985, and the additional documents produced November 26, 1985, conclusively establishes that Pemex failed to comply fully with the subpoenas and the court orders of December 30, 1983, January 17, 1984, and July 17, 1984, directing that "all" requested documents be produced promptly.
 
 
 72
 Pemex contends that it acted in good faith and that such nonproduction was excusable, but its contentions are not persuasive based on the facts established at the hearing and the Court's assessment of the credibility of the witnesses, for the reasons explained below.
 
 
 73
 22. Pemex contended, through the testimony of Lic. Reyes, that it was unable to locate the documents earlier because of the supposed vagueness of the subpoenas, in contrast to the greater specificity of the April 2 order. The Court does not find Lic. Reyes' testimony to be credible. By his own admission, the vast majority of the records produced on April 29 were found not because of greater specificity of the order, but because Pemex suddenly discovered a cache of files in the office of Ing. Gildardo San Martin Berman. Furthermore, while the subpoenas were broad in the sense that they sought numerous categories of documents, they were not vague; indeed, every one of the purchase orders and requisition numbers specified in the April 2 order which Reyes claimed helped Pemex find documents after the order was issued were also specified in the original subpoenas. Likewise, the majority of the Pemex internal bidder selection recommendations finally produced on April 29 were also specifically identified by number in the January subpoena.
 
 
 74
 23. Pemex also contended that its original search failed to locate the documents produced on April 29 because Ing. San Martin was either on vacation or out of the office at the times the search was conducted. Again, the explanation is not credible. Ing. San Martin was employed by Pemex during the entire time the search was purportedly conducted, and while he claimed on direct examination not to have been involved in the purchasing process, he conceded on cross-examination not only that he was the head of the production department group in charge of analyzing the technical aspects of bids on gas compression equipment, but that he actually initiated requisitions, drafted the memoranda recommending the supplier, and prepared at some unspecified time the comprehensive analysis of all gas compression equipment procurements during 1977-79. San Martin also testified that at least three other persons in the production department knew of the existence of the files in his office, none of whom was shown to be out of the office during the height of the search activity. And perhaps most significantly, San Martin revealed on cross-examination that his files were searched in December 1983 by Engineer Rene Martinez Decuit, whom San Martin directly identified as a Pemex employee who knew of the existence of the files in his office, yet the obviously relevant documents were not discovered. San Martin's opinion that none of the documents were discovered at that time because the files were ill-organized is the only suggestion offered as to why these documents were not timely produced to the defendants. This opinion cannot be credited in view of the fact that according to Lic. Reyes, the vast majority of the 2,731 pages of documents produced April 29 were in the files supposedly searched previously, and in view of the obviously relevant, responsive and even exculpatory nature of many of the documents located in the files. The Court found San Martin to be a most evasive and wholly incredible witness.
 
 
 75
 24. Pemex also contended, again through the testimony of Lic. Reyes, that the naming of San Martin in one paragraph of the list attached to the April 2 order explains why Pemex was able to locate the documents at that time but not earlier. In view of San Martin's obviously key role in these procurements, a fact well known to Pemex, no identification of him was necessary; but the fact is that he was named in an affidavit attached to the defendants' motion for an order to show cause served upon Pemex's counsel on February 13, 1985, yet according to Pemex, no one thought to ask him for documents until after April 2.
 
 
 76
 25. Pemex further contended generally that while numerous responsive documents were obviously not produced prior to April 29, its search was nonetheless as diligent, thorough, and in good faith as the law requires. This contention is contradicted by the fact that when the defendants, after repeatedly detailing the gaps in Pemex's compliance through correspondence, moved for and obtained the further order of July 17, 1984, compelling full compliance without further delay, Pemex did not undertake any further meaningful search of its files, but simply circularized the various departments with a memorandum repeating the requests of six months earlier and obtained, not surprisingly, cursory replied within a matter of 48 hours at the most, stating that all documents had previously been supplied. The contention is also contradicted by the fact that the Pemex official memoranda were maintained on microfilm, yet several of these memoranda--specifically identified by number in the defendants' subpoenas--were not searched for or produced until after the April 2 order, some sixteen months after they were requested.
 
 
 77
 26. Based upon all the evidence, the Court finds by clear and convincing evidence that the documents produced on April 29, 1985 and November 26, 1985 (with the exception of one document obtained from an outside engineering firm) did exist in Pemex's files in December 1983 and continuously thereafter; that the documents were plainly called for by the subpoenas and court orders of December 30, 1983, January 17, 1984, and July 17, 1984, that a conscientious search conducted in good faith would have located those documents; and that Pemex either did not search the files in good faith, or did not produce the documents when located. The Court further finds that the nonproduction served Pemex's interest in hindering the defendants' ability to defend against criminal charges very similar to the civil complaint being pursued simultaneously by Pemex against these same defendants; that the documents were finally produced only after the defendants, after great expenditure of time and expense, proved in open court not only the existence of the documents, but that they had discovered Gildardo San Martin's access to, familiarity with, and likely retention of them; and that certain testimony by Pemex representatives at the hearing on June 10, 1986, as to the purported reasons for nonproduction of the documents prior to April 29, 1985, was not credible. The Court also finds that Pemex had adequate notice of the nature of this hearing yet failed to produce one witness responsible for record-keeping or preparing any of the requested documents. Based upon these factors and the entire record of this proceeding, the Court further finds that beyond a reasonable doubt Pemex's failure to comply fully with the subpoenas and court orders was willful and inexcusable.
 
 
 78
 F. Pemex's Explanation of the Continued Nonproduction of
 
 Documents
 
 79
 27. Even with the additional production following the April 2 order, Pemex has failed to produce most of the underlying documents it received or generated in connection with the bids and awards at issue. Pemex's own witnesses conceded that the documents are types customarily prepared and kept by Pemex, and the testimony of John Sherman as well as the Pemex procurement internal procedures demonstrated not only that the documents were prepared but that copies were disseminated to numerous departments of the corporation.
 
 
 80
 28. Pemex contends a fire in September 1982 destroyed the unproduced records. This contention was not advanced until the hearing on the order to show cause on April 1, 1985. It was not mentioned in Pemex's motion for a protective order filed December 8, 1983, regarding the first subpoena. It was not mentioned by Pemex at the hearing on that motion before Judge Cire on December 20, 1983. It was not mentioned when in June 1984 the defendants filed a detailed motion to compel production, particularly describing the wholesale failure to Pemex to produce critical categories of documents; indeed, Pemex filed no response to this motion at all. It was not mentioned in response to Judge Cire's July 17, 1984, order to produce "all documents called for in the subpoenas 'without further delay.' " It was not even mentioned in Pemex's opposition to the motion for an order to show cause, which gave as the sole reason for missing documents the speculation that "Crawford was somehow involved with the former Pemex employees in 'covering their tracks.' " It was not mentioned in any other pleading, transcript or even correspondence prior to the time Pemex faced contempt sanctions on April 1, 1985. Indeed, even when the defendants by letter to Pemex's counsel in May 1984 specifically requested that Pemex indicate, in the event any requested documents no longer existed, whether they had been "destroyed, either by fire or otherwise," no response was forthcoming.
 
 
 81
 29. The evidence as to the fire does not establish that the mass of relevant bidding and award documents described on Defendants' Exhibit 44 are not in existence. While there was undoubtedly a fire in the upper floors of Building B-2 in September 1982, the contention by the witnesses Solis and Reyes that all documents missing from the production were destroyed in that fire is not persuasive. Both witnesses conceded on cross-examination that they had no personal knowledge that any particular subpoenaed document was destroyed. No custodian of the files was called as a witness, nor was any post-fire report or damage assessment produced, even though Lic. Reyes testified a report was filed with the Mexican Justice Department. Further, certain photographs of the fire themselves show that great quantities of records survived the fire. Also, the record shows that files were routinely transferred by Pemex to storage facilities in which there was no fire, and that there was no fire in Building A-1 where the Purchasing Department was located.
 
 
 82
 30. In addition, the evidence showed that numerous copies of records of the type subpoenaed by the defendants were received and prepared, including 7 to 20 copies of bids, and copies of internal memoranda that were addressed to as many as 15 recipients throughout Pemex. The Purchasing Department, Production Department, Department of Planning and Budget, and Auditing Department all, according to Pemex procedures, received complete files of the bidding contests. The fire does not satisfactorily explain the absence of the mass of critical documents shown by this record to have existed in various locations throughout Pemex.
 
 
 83
 31. Based upon the evidence demonstrating the existence of the specifically identified and requested records in the hands of Pemex, the obvious fact that the majority of these records have not been produced even as of this time, and the conduct of Pemex in response to the continued efforts of the defendants and the Court to obtain full compliance with the subpoenas, the Court finds beyond a reasonable doubt that Pemex has failed to comply with the subpoenas of December 1983 and January 1984 and the orders of this Court dated December 30, 1983, January 17, 1984, and July 17, 1984. The Court further finds beyond a reasonable doubt that Pemex has willfully disobeyed these subpoenas and court orders.
 
 
 84
 32. Crawford defendants have presented an uncontested statement of costs and fees amounting to $79,431.25. The Court finds these costs and fees to be reasonable and necessary in bringing and prosecuting this contempt proceeding.
 
 
 
 [1]
 A second supplemental subpoena was served upon Pemex on January 13, 1984, directing that documents in six additional categories be produced. On January 17 the district court again ordered full compliance with the subpoena
 
 
 [2]
 While the above criminal discovery was proceeding, Pemex's civil action against Crawford was transferred to the docket of the same judge overseeing the criminal prosecution. The judge initially stayed most discovery efforts in the civil matter while the criminal discovery problems between the parties Crawford and Pemex were being resolved. However, on February 13, 1984, in the civil action the district court did order Pemex to produce a list of all documents Pemex had obtained from the Mexican Attorney General that related to matters involved in the parallel civil and criminal proceedings. Crawford concedes that Pemex has complied with this order
 
 
 [3]
 The order to show cause encompassed not only the discovery disputes involved in the criminal proceeding but also whether Pemex had complied with the court's February 13 order in the civil action
 
 
 [4]
 At the April 1 hearing Crawford and Pemex agreed that Pemex had complied with the February 13 discovery order in the civil action
 
 
 [5]
 The court and parties agreed on the April 15 production date, even though Crawford's criminal trial was set for April 8, because it was not anticipated that Crawford's defense would not begin until April 15. The April 15 deadline was later extended two weeks to April 29 by order of the court
 
 
 [6]
 In July 1985 Crawford and several other defendants in the criminal proceeding were sentenced pursuant to their nolo contendere pleas
 
 
 [7]
 Before the hearing Pemex produced another four documents specifically described in the court's April 2 order
 
 
 [8]
 Pemex does not challenge the rulings on sovereign immunity and notice in this appeal
 
 
 [9]
 The Special Master's powers were "limited to the collection of documents and/or explanations for documents produced in accordance with this order, comparison of the production with the two subpoenas and Exhibit 44, and preparation of a report to be filed with this court on the compliance with this order."
 
 
 [10]
 At oral argument Pemex suggested that we should not re-examine the jurisdictional issues presented because a motions panel of this court in this appeal has already refused Crawford's request to dismiss Pemex's appeal. This argument is without merit. It is well-settled in this circuit that the denial of a motion to dismiss by a motions panel is provisional and the oral argument panel enjoys the prerogative to fully consider any jurisdictional issue. See In re MDL, 799 F.2d 1076, 1079 (5th Cir.1986); Equal Employment Opportunity Comm'n v. Heches Butane Products Co., 704 F.2d 144, 147 & n. 2 (5th Cir.1983); CFTC v. Preferred Capital Inv. Co., 664 F.2d 1316, 1318 (5th Cir.1982). This is so because the jurisdiction of this court over an appeal is subject to examination at any stage
 Such is not the rule, however, when a panel of this court in an earlier appeal has ruled upon a question of jurisdiction over the appeal. In such an instance, the earlier ruling is subject to the "law of the case" doctrine and may not be set aside in a subsequent appeal by a panel of this court absent a showing of certain exceptional circumstances. See Anderegg v. High Standard, Inc., 825 F.2d 77, 79-80 (5th Cir. 1987).
 
 
 [11]
 While the district court's characterization is certainly not controlling, see Lewis, 534 F.2d at 1119; Thyssen, 693 F.2d at 1173, it can be considered
 
 
 [12]
 While we do not address the propriety of the criminal contempt finding, we would point out for the parties and district court's benefit that the Supreme Court has recently held that interested private attorneys may not be appointed to prosecute criminal contempts. See Young v. United States ex rel. Vuitton et Fils S.A., --- U.S. ----, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Since we lack jurisdiction to review the criminal contempt finding, we must allow the district court the opportunity in the first instance to take any action that it deems proper in light of Young
 
 
 [13]
 Pemex relies on several older cases to argue that since the findings of fact rendered by the district court track Crawford's proposed findings they are entitled to less deference. This argument is meritless in light of the Supreme Court's explicit rejection of it in Anderson. See Anderson, 470 U.S. at 572, 105 S.Ct. at 1511
 
 
 [14]
 The court provided in its appointment:
 Mr. Evans' powers shall consist of and be limited to the collection of documents and/or explanations for documents produced in accordance with an accompanying order, comparison of the production with the subpoenas of December 1, 1983 and January 13, 1984 and Exhibit 44, and preparation of a report to be filed with this court on the compliance with this order. The report should include as exhibits any explanations offered by Pemex for documents that are not produced.